**UNITED STATES of America**

v.

**Thomas HENSHAW.**

**Crim. No. 87–296–05.**

United States District Court, E.D. Pennsylvania.

May 18, 1988.

Edward S.G. Dennis, Jr., U.S. Atty., Gary S. Glazer, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Robert Hoffa, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court is defendant Thomas Henshaw's ("Henshaw") motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29(c) and/or for a new trial pursuant to Fed.R.Crim.P. 33. For the reasons stated herein, the motions will be denied.

## I. BACKGROUND

Henshaw was charged along with four other defendants in a six count indictment. The court severed Henshaw from the trial of the other four defendants because he, unlike the other four defendants, was *not* charged in Count One, the § 1962(d) RICO conspiracy count. Henshaw was only charged in Count Four of the indictment. Count Four charged Henshaw with Hobbs Act extortion in violation of 18 U.S.C. § 1951 and with aiding and abetting in violation of 18 U.S.C. § 2. After a jury trial that began on March 25, 1988 and ended with a jury verdict on March 29, 1988, Henshaw was found guilty of violating 18 U.S.C. § 1951 and 18 U.S.C. § 2.

On April 8, 1988, eight court business days after the jury's verdict was recorded and the jury was discharged, Henshaw filed the one page motion now before the court and the government filed its one page response. Henshaw's motion rests on the following argument: "[d]efendant avers that the Court erred in permitting the tape recorded conversations to be played to the Jury with Kenneth Harris being named as a party to the conversation." Defendant's Motion, the third and last numbered paragraph. Henshaw did not file a memorandum to support his motion. The government's response corrects two inaccuracies contained in the first two numbered paragraphs of Henshaw's motion and responds to the above quoted third numbered paragraph as follows: "[d]enied as a conclusion of law. *See* Rules 801(d)(2)(D), (E), Fed.R. Evid."

## II. DISCUSSION

Fed.R.Crim.P. 29(c) provides in pertinent part:

(c) *Motion After Discharge of Jury.* If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period.

Fed.R.Crim.P. 33 provides in pertinent part:

A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

■ At the outset the court finds that it must deny Henshaw's motion since it was not *filed* within the seven (7) day period, which ended on April 7, 1988. The court notes, however, that: (1) the certificate of service accompanying the motion was dated April 6, 1988, and stated that service was made that same day by first class mail postage prepaid; (2) the court received a courtesy copy of Henshaw's motion on April 8, 1988, together with a cover letter dated April 7, 1988; and (3) the govern-

ment's response was filed the same day as the motion it was responding to. These three facts might lend support to an argument by Henshaw that his motion experienced some sort of routing delay; however, no such argument has been made by him. The court raises the question of filing out of time *sua sponte* and is disturbed by both parties' failure to recognize and address this fundamental issue.

Rather than sit idly by to wait for an explanation, if any can be given, as to this procedural flaw in Henshaw's motion, the court proceeded to examine the merits of the motion only to find that it is lacking there as well. Thus, the court will deny Henshaw's motion because it was not timely filed and even if it was it is without merit.

The government played six (6) tape recorded conversations to the jury: Exhibits G–62, G–68, G–78, G–80, G–81, and G–91. Henshaw's motion only contends that the court erred in permitting to be played to the jury the tape recorded conversations in which Kenneth Harris ("Harris") was named as a party to the conversation. Since Harris was not named as a party to tape No. 81 (Exhibit G–81), Henshaw does not contend that it was error to allow that tape to be played. Since Harris was named as a party to the other five tape recorded conversations that were played to the jury, the court will examine each tape in search of the error that Henshaw's motion alleges but does not identify.

■ Both Henshaw and Harris are named as parties to the conversations in tapes G–62, G–68, G–78, and G–80. In tapes G–62 and G–80 there are also other named speakers in the conversations. Before any of those tape recorded conversations were received into evidence, the government introduced the testimony of a witness who identified each speaker's voice with their name except for the unidentified male on tape G–62 and the unidentified female on tape G–80. For example, with regard to tape G–62, which was a product of the wiretap on one of the two telephone lines in Harris' judicial chambers, the government witness (FBI Special Agent

Alfred J. Ventura) testified at trial that the four speakers were an unidentified male who answered the telephone by saying "Criminal Listings," Henshaw, Harris and Edward "Eddie" Attanazio ("Attanazio"). Henshaw may be challenging the admissibility of Harris' part of the conversation with Attanazio on the basis that Harris' statements should not have been admissible as co-conspirator statements because Henshaw was not charged with the crime of conspiracy. Such a challenge fails because the co-conspirator or joint venturer exception to the hearsay rule of evidence can apply even though a defendant is not charged with the crime of conspiracy. *See United States v. Trowery,* 542 F.2d 623, 626 (3d Cir.1976). "[T]he absence of a conspiracy count has no bearing on the court's determination of the competence of co-conspirator evidence." *Id.* at 627.

■ Since the court found that the government had proved, by a preponderance of the non-hearsay evidence, that a joint undertaking existed at the time of the tape recorded conversations at issue, such conversations were competent evidence to be considered by the jury against Henshaw. Harris' portions of the conversations were thus properly admitted into evidence and such evidence was competent as against all who were joint venturers. *See Trowery, supra,* 542 F.2d at 627; 1 Weinstein's Evidence ¶ 104[5].

Thus, on the basis of the rulings and reasons placed on the record at trial, as well as those set out above, the court concludes it was not error to receive those tapes into evidence and to allow them to be played to the jury and considered by the jury.

The only other tape played at trial was tape G–91 which was recorded at approximately 12:31 P.M. on October 10, 1986. The three speakers whose voices can be heard on the tape recording are Harris, Conrad Cheeks ("Cheeks"), and an unidentified male. Tape G–91 does not contain Henshaw's voice. Tape G–91 was a product of the microphone "bug" hidden in the anteroom (a/k/a robbing room) which is a small room attached to courtroom 313. At

that time, the anteroom had a desk, a couple of chairs and a telephone on the desk. Since the wiretap on the anteroom telephone, (215) 686–7484, ended on October 8, 1986, there is no recording as to what was said by any speaker who was talking over a telephone to a person who was listening on the anteroom telephone on October 10, 1986. For example, if Henshaw telephoned 686–7484 (the anteroom telephone) and Cheeks or Harris answered the telephone and a conversation ensured, the anteroom "bug" would pick up and record what Cheeks or Harris or anyone else in the anteroom said but there was, at that time, no telephone wiretap to pick up and record what Henshaw said.

The transcript of tape G–91 that was prepared by the government was marked as Exhibit G–91T and a copy of G–91T is attached hereto.

Tape G–91 begins with Cheeks saying to Harris, "I got Tommy Henshaw on the line. He said what did you want him to do?" The government's evidence indicated that Cheeks' use of the phrase "the line" referred to the telephone line inside courtroom 313 itself as opposed to the anteroom telephone line. After Harris says something in response to what Cheeks first said, Cheeks tells Harris, "Back phone. He's calling on the back phone." And then, within a matter of seconds, the telephone in the anteroom rings and Cheeks answers it by saying, "313. Hold on." Next Harris spoke on the telephone with whomever was on the other end of that telephone connection. The government's position was that the person on the other end of the telephone line was Henshaw. To support that position the government cited the other tapes and the testimony of Detective William Schol ("Schol"). Schol testified that Cheeks answered the telephone inside courtroom 313 and then while the caller was still on the phone and while Harris was on the bench in courtroom 313, Cheeks had a conversation with Harris. On tape G–91 Cheeks is heard saying, "I got Tommy Henshaw on the line." Harris then is heard speaking to Cheeks on G–91 and saying, "Well, I can't get him. Tell him I want to see him because they need some-

thing. (UI)." A reasonable interpretation of those words would be that Harris meant he could not receive Henshaw's telephone call at that time and/or on *that* telephone. Harris also says, "Tell me what you want me to say." It sounds as if Harris was directing this last sentence not to Cheeks but to the unidentified male whose voice is next heard to say, "All right, that's it." Cheeks next is heard to say, "(UI) Back phone. He's calling on the back phone." The government's position is that Cheeks was telling Harris that Henshaw would be calling back on the anteroom telephone. Schol testified that just after Cheeks answered the telephone inside courtroom 313 and had a conversation with Harris, Schol heard the telephone in the anteroom ring.

In sum, the government's position here is that Henshaw telephoned into the courtroom (*i.e.*, the "front" phone); Cheeks answered and then told Harris that Henshaw was on the line; Harris told Cheeks to have Henshaw phone back; some seconds later the anteroom phone rang and Cheeks answered it by telling the caller (Henshaw) to hold on; Harris then picked up the telephone receiver and had a telephone conversation with Henshaw, but only Harris' side of that conversation can be heard. Harris' side of the conversation is incriminating and is what was offered and received into evidence. Henshaw probably believes that was error on the ground that there was insufficient evidence that Henshaw was on the telephone and the only such evidence would be an inference from Cheeks' previous hearsay statement that, "I got Tommy Henshaw on the line."

A review of the other admissible evidence in the case demonstrates why these otherwise hearsay statements were properly admissible. There was admissible evidence that the extortion victim, Alvis Mapp ("Mapp"), had met face-to-face with Henshaw in courtroom 313 (Harris' courtroom for the pertinent period in 1986) on three occasions: August 29, 1986, August 31, 1986, and September 23, 1986. Mapp testified that on some or all of these occasions Henshaw wore a court officer's coat and that Henshaw suggested to Mapp that

Mapp would have to make a payment to him; otherwise Mapp would go to jail. The government's surveillance officers observed Henshaw in courtroom 313 many times, although none of them saw him wearing a court officer's blazer or coat. The testimony was that between April and October Henshaw was in Harris' courtroom at least three times a week and in many instances he was seen going in and about the courtroom in different locations. There was also testimony that Henshaw responded to Harris' beckoning hand signals which directed Henshaw who would be somewhere in the courtroom to go back into the anteroom. Henshaw would often go into that anteroom and talk to Harris with the anteroom door that leads to the courtroom closed. There is evidence by stipulation that Henshaw was never an employee of the Philadelphia court system and there is no other explanation for his routine presence at courtroom 313 other than *some* regular private courtroom relationship with Harris. There was evidence that Cheeks was in the courtroom on a daily basis and that he was an official employee of the court; he was Harris' "Judicial Aide" (a/k/a "Personal Aide"). Newton Endy ("Endy"), a court officer, also testified that Henshaw was in courtroom 313 regularly and met with Harris regularly, but Endy was not privy to those conversations because they took place in the anteroom.

The tape recordings that were both recorded before and received into evidence before tape G–91 support the admissibility of tape G–91. Up to tape G–91 there are various admissible tapes on which Henshaw was recorded talking to Harris about matters pertinent to the *Mapp* matter. On both tape G–78 and G–91 Harris is asking for "bread" (money). On both tape G–62 and G–78 reference is made to the date of the "23rd." On tape G–62, recorded September 5, 1986, Henshaw is heard telephoning the office of criminal case listings in City Hall to speak with Eddie Attanazio, after which Henshaw hands the telephone receiver to Harris who asks Attanazio who will be presiding over the preliminary hearings at the Front Street and Westmoreland Avenue location on September 23rd, and presumably while Attanazio is searching his papers for the answer to that question, Harris asks Henshaw (who is in Harris' office with Harris), "What's his name?" Henshaw answers, "His name is Mapp, Alvis Mapp." On tape G–78, recorded in the anteroom on September 17, 1986, Harris is heard asking Henshaw, "You got anymore bread today?" and Henshaw answers, "Okay, after, after the (unintelligible)." Harris next asked Henshaw when that event would occur after which Henshaw would have more money for Harris. Henshaw answered that the event would occur on the 23rd. Based on these conversations, Mapp's testimony, the testimony of the two surveillance agents and the testimony of Deputy Court Administrator Joseph Cairone, the government's position as to the significance of tape G–78 was that the event in question was Mapp's September 23rd preliminary hearing at Front Street and Westmoreland Avenue and Henshaw said that after that Henshaw would have more money for Harris.

In light of the foregoing evidence the court concluded that the government proved by at least a preponderance of the non-hearsay admissible evidence that a joint undertaking or venture existed between Harris, Henshaw, Cheeks and others at the time of the tape recorded conversations so that the conversation between Harris and Cheeks on tape G–91 was elicited, authorized and/or consented to by Henshaw. Accordingly, tape G–91 and specifically Cheeks' statement that "I got Tommy Henshaw on the line," was properly admitted against Henshaw as co-conspirator statements that are admissible pursuant to the co-conspirator or joint venturer exception to the hearsay rule, and/or as a statement of a person who would be an agent of Henshaw instructed to give that message to Harris. *See* Fed.R.Evid. 801(d)(2).

Henshaw's *only* witness, James Shuler, testified that Henshaw knew Harris and that Shuler had recommended Henshaw to Mapp for the purpose of securing an attorney for Mapp. It seems plain that the jury could easily infer that this evidence was in keeping with Henshaw's intentions of

carrying through with the extortion that the victim (Mapp) testified actually occurred with the payment of $500.00 from Mapp to Henshaw in Buddy's Bar to have the *Mapp* case referred at the October 7, 1986 arraignment to be tried and decided by Harris.

III. CONCLUSION

For all of the foregoing reasons, Henshaw's motion for judgment of acquittal and/or for a new trial will be denied.

An appropriate Order will be entered.

APPENDIX

PH 194C–433

1

DATE: 10/10/86

TIME: 12:31 PM

EDPA: 674

    KH—JUDGE KENNETH HARRIS
    CC—CONRAD CHEEKS
    UM—UNKNOWN MALE
    UI—UNINTELLIGIBLE

CC: I got Tommy Henshaw on the line. He said what did you want him to do?

KH: Well, I can't get him. Tell him I want to see him because they need something. (UI) Tell me what you want me to say.

UM: All right, that's it.

CC: (UI) Back phone. He's calling on the back phone.
(Court proceeding)
(Phone rings)

CC: 313. Hold on.

KH: (On phone) Good morning. How you feeling? They set the date and I need the bread. I'm talking about profit, us, me and you. What the, it, it was set the other day, you know, cause he was doing the arraignments then. Okay. Right. Yes, sir, you got to pay those people for putting it there. All right. Right.
(Hangs up) (UI)